# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *J.S. Riemer, Inc. v. Village of Orland Hills*, 2013 IL App (1st) 120106

---

| | |
|---|---|
| Appellate Court Caption | J. S. RIEMER, INC., Plaintiff and Counterdefendant, v. THE VILLAGE OF ORLAND HILLS, an Illinois Municipal Corporation, Defendant and Counterplaintiff and Third-Party Plaintiff-Appellant (Barclay and Associates, Third-Party Defendant-Appellee; Robert R. Slanker and Associates, Ltd., an Illinois Corporation, and Testing Service Corporation, an Indiana Corporation, Third-Party Defendants). |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-0106 |
| Filed | May 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a village's third-party complaint for fraud and breach of contract against the architectural firm involved in the construction of village's community center, the trial court properly entered summary judgment for the architect on the ground that the complaint was barred by the four-year statute of limitations for actions with regard to the design, management or supervision of construction, notwithstanding the village's contention that the firm was estopped from raising the statute of limitations and fraudulently concealed the village's cause of action by its misrepresentations that the excavator caused the building's floor to sink into the ground, since a reasonable party in the village's position would have been on notice that was caused by the architectural firm's authorization of the inadequate excavation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-0595; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Mark Sterk, of Odelson & Sterk, Ltd., of Evergreen Park, and Michael J. Wall, of Rothschild, Barry & Myers LLP, of Chicago, for appellant.

Thomas B. Orlando, Douglas J. Palandech, and Garrett P. Kern, all of Foran Glennon Palandech Ponzi & Rudloff PC, of Chicago, for appellee.

Panel

JUSTICE TAYLOR delivered the judgment of the court, with opinion.
Justices Howse and Palmer concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Village of Orland Hills (Village) appeals from the trial court's grant of summary judgment for third-party defendant Jack Barclay & Associates (Barclay) pursuant to the four-year statute of limitations for actions concerning the design, management, or supervision of construction.

¶ 2    The Village hired Barclay to perform architectural services for the construction of a new community center building for the Village. The building was substantially completed by July 1, 2001. It is undisputed that the concrete floor of the building is sinking into the ground because it was built over peat, which is being compressed by the weight of the building.

¶ 3    The Village brought suit against Barclay on December 8, 2006, seeking damages for breach of contract and fraud. Barclay moved for summary judgment on grounds that the Village's suit was time-barred. The trial court granted its motion. The Village now appeals, contending that Barclay is estopped from raising the statute of limitations because of certain alleged misrepresentations that it made to the Village. For the reasons that follow, we affirm the judgment of the trial court.

¶ 4                                    I. BACKGROUND

¶ 5    The following facts are undisputed for purposes of this appeal. Barclay is engaged in the business of providing professional architectural services. On September 16, 1999, the Village entered into a written contract with Barclay to perform architectural and design services in connection with the construction of a new community center. The contract between the Village and Barclay, which was modeled upon a standard form contract produced by the American Institute of Architects, contains the following provision (hereinafter Article 9.3):

"9.3.    Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate of Payment for acts or failures to act occurring after Substantial Completion."

¶ 6 Barclay submitted plans and specifications to the Village which, among other things, called for certain excavation work to be done. The Village then hired J.S. Riemer, Inc. (Riemer), to perform the specified excavation work. Riemer excavated the project site on August 10 and 11, 2000.

¶ 7 The community center was substantially complete by July 1, 2001. However, as shall be detailed further below, it was subsequently discovered that the concrete floor of the building was sinking into the ground because it was built over peat that had not been excavated prior to the construction of the building.

¶ 8 On January 18, 2005, Riemer brought suit against the Village because it had not been paid in full for its excavation work. (We need not discuss the details of this suit, since Riemer is not a party to the instant appeal, nor is its liability at issue here. The only parties to the instant appeal are the Village and Barclay.) On April 15, 2005, the Village filed a counterclaim against Riemer, alleging that Riemer improperly excavated the project site. The Village also filed counterclaims against Robert R. Slanker & Associates, the construction manager, and Testing Service Corporation (TSC), a company which the Village hired to perform tests on the soil at the project site.

¶ 9 On December 8, 2006, more than five years after the date of substantial completion for the building, the Village filed a third-party action against Barclay. This action is the subject of the instant appeal. The Village's second amended complaint, which frames the issues now before us, alleged the following. Under the terms of the parties' contract, Barclay agreed to prepare drawings, plans, and specifications for the construction of the building, and Barclay also agreed to inspect the construction work in order to make sure that it complied with its plans and specifications. As part of this work, Barclay ordered that various soil tests be performed on the site. These tests showed that the building site contained extensive deposits of peat. However, according to the Village, Barclay's plans and specifications for the building were defective in that they did not require the removal of all the peat from the site. Additionally, Riemer did not complete all the excavation work required by Barclay's specifications, and Barclay was allegedly informed of this fact, but Barclay nevertheless gave its approval for the pouring of the concrete floor.

¶ 10 The Village further alleged that in the late summer of 2002, the concrete floor of the building began separating from the foundation walls and appeared to be sinking into the ground. When asked by the Village to give its opinion on the cause of the sinking floor, Barclay told the Village that it was the fault of the excavator Riemer for not compacting the earthwork and fill under the floor. Barclay also called for measurements to be made at various times from November 2002 to February 2005, measuring the depths to which the floor was sinking. A report by the soil testing company in March 2003 stated that the floor was located over "underlying unsuitable soils." However, according to the Village, Barclay continued to deny that its design was defective and continued to blame Riemer for the problems with the building. The Village additionally alleged that, in reliance upon the expertise of Barclay, it pursued litigation against Riemer and against the construction manager but forbore to bring suit against Barclay.

¶ 11 Based upon these allegations, the Village's complaint sought relief against Barclay in

three counts. The first count is for breach of contract. The second and third counts are for fraudulent concealment and fraudulent misrepresentation, based upon Barclay's alleged assertions that Riemer alone was to blame for the problems with the building.

¶ 12    Barclay moved for summary judgment, contending that the Village's suit was time-barred under section 13-214 of the Code of Civil Procedure (735 ILCS 5/13-214(a) (West 2010)), which provides a four-year statute of limitations for actions "against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property." Barclay also contended that it was not equitably estopped from raising the statute of limitations, because the Village had sufficient information to bring suit against Barclay within the period of limitations. Specifically, Barclay argued that the Village knew all of the following by March 2003: (1) Barclay's original plans called for the excavation of peat from the building site; (2) Barclay subsequently approved a change to that plan whereby the peat was not properly excavated; and (3) a March 19, 2003, report by TSC attributed the problems with the building to the fact that it was built over "unsuitable soils."

¶ 13    In support of its motion for summary judgment, Barclay attached the deposition testimony of John Daly, the Village manager, and Joseph Ennesser, the Village's building commissioner. Daly testified that a TSC soil report dated December 8, 1999, indicated the presence of peat at the project site. According to Daly, Barclay's original excavation plan involved the removal of all of the peat from the site. Pursuant to Barclay's plan, the bid for the excavation job called for the removal of six feet of unsuitable soil. Daly testified that Barclay assured the Village that it would oversee the construction efforts "at all critical times," including during the excavation.

¶ 14    As noted, the excavation of the project site took place from August 10 to 11, 2000. Daly testified that Riemer failed to excavate to the full six-foot depth specified in the bid. At this point in the deposition, counsel for Riemer showed Daly a letter, dated August 12, 2000, that the construction manager had sent to Daly. The letter stated: "The excavation went well, and by the end of the day, August 11, 2000, we had reached acceptable soils without entering into any additional unit costs for excavation." Daly said that he recalled reading the letter on or about that date. Prior to the issuance of that letter, Daly had told the construction manager that Barclay needed to approve the excavation work before proceeding with filling and compacting. "I want a signoff from Barclay," he said, "or you're not going to start anything." Daly testified that the construction manager confirmed that Barclay had indeed approved the excavation work at issue.

¶ 15    Daly additionally testified that the problems with the building floor first manifested in around late 2001 to early 2002. Upon Barclay's advice, the Village ordered various tests to be performed and submitted the results of those tests to Barclay. "Again," Daly stated, "we were relying on Barclay & Associates to guide us as they had from the onset with this project and to utilize their expertise in determining what actions to take throughout the entire process."

¶ 16    Barclay next presented the deposition testimony of Ennesser, the Village's building commissioner, which was largely in accord with Daly's deposition testimony. Ennesser

-4-

stated that at a Village committee meeting prior to the excavation, he heard "the architects and everyone" saying that a lot of soil would have to be excavated from the project site. Subsequently, Ennesser observed the excavation work that had been done at the site. He stated that based upon the previous discussion, he had been expecting to see "quite a large hole in the ground," and he was concerned that it was not happening.

¶ 17      On or around August 11, 2000, Ennesser expressed this concern to Robert Slanker, the construction manager. "I asked him if the architect was aware of it," Ennesser stated. "He said he was." Ennesser then spoke with a Barclay architect named Leonard Sawosko, asking him why more soil was not being removed. Sawosko replied that subsequent testing showed that the current level of excavation was sufficient to support the floor. After that conversation, Ennesser said, "I just let it go because I assumed he was the man in control and knew what he was doing, and I kind of put my faith into him, so...." He testified that Barclay, as "the authority on the job," would have been authorized to make changes to the original specifications for excavation.

¶ 18      Ennesser additionally testified that at some point, he discussed with other Village personnel the possibility of receiving credit from Riemer because Riemer excavated less soil than the amount indicated in the bidding specifications. "They didn't do all of the work," he explained. "They didn't excavate as much as they were supposed to. *** [A]nd so I assumed that we should get a credit."

¶ 19      Ennesser finally stated that in his opinion, the cause of the problems with the building was "bad soil" under the building slab. When asked how he came to that opinion, he replied, "Just because originally, I think as I stated before, the original soil borings showed that there was bad soil there. And the fact that it's still there and we're having problems, it just kind of adds up, you know."

¶ 20      Barclay also attached a copy of TSC's report, dated March 19, 2003, and addressed to Glenn Bilina, the director of the Village's department of recreation. In the report, TSC states that between November 2002 and March 2003, TSC took five sets of elevation readings of the building floor. All measured points settled approximately three-fourths to one inch during that time period. The report further states: "It is our opinion that the settlement observed has occurred because the foundation of the building is supported on caissons, while the floor slab is floated over the underlying unsuitable soils."

¶ 21      The Village filed a response to Barclay's motion for summary judgment in which it contended that Barclay was equitably estopped from raising the statute of limitations. It stated that when the floor of the building started to sink, the Village sought Barclay's opinion as to what was happening and why. According to the Village, Barclay actively and affirmatively misled the Village as to the cause of the problem, shunting blame to Riemer instead of admitting its own fault, and the Village relied upon these misrepresentations in forbearing from suit against Barclay.

¶ 22      In support, the Village attaches the deposition testimony of Bilina, the director of the Village's department of recreation. Bilina testified that approximately six to eight months after the building was substantially complete, he observed that the floor was sinking. He and Daly called one of Barclay's architects, Jack Barclay, to inspect the building. Bilina testified

that Jack Barclay "basically said it was the compaction. It wasn't compacted properly." Jack Barclay then advised the Village to have elevation measurements taken, which the Village did.

¶ 23     The Village also attaches correspondence between Barclay and the Village. The first such exhibit is a letter dated March 2, 2005, sent from Barclay to Bilina, in which Barclay discussed the cause of the problems with the building:

> "As I recall, this area of the building had the poorest soil, and it was necessary to provide the largest amount of earthwork and fill. It is my opinion, therefore, that the compaction of such earthwork and filling was not done correctly, which would be the cause of the settlement observed in these area [*sic*].
>
> My suggestion is to have these areas cored by an independent soil testing company, as a means of determining exactly what is the cause of the settlement."

¶ 24     The Village next attaches a letter dated December 10, 2005, from Jack Donovan, Barclay's retained structural engineer, to Daly. With regard to the cause of the problems with the building, Donovan stated: "The job specifications required existing sub-grade to be tested, then compacted or removed and replaced, if necessary. *** I have not been able to find any evidence that this was done."

¶ 25     On September 12, 2011, after hearing oral argument by the parties, the trial court granted Barclay's motion for summary judgment. In rendering this decision, the court specifically cited TSC's report to the Village dated March 19, 2003, in which TSC attributes the cause of the building problems to "unsuitable soils." The court explained: "[T]his letter, to me, seems to clearly indicate that [the Village] should have pursued the architect and could have pursued the architect well before the Statute of Limitations expired." Thus, the trial court granted summary judgment for Barclay on all counts. The Village now appeals.

¶ 26                                    II. ANALYSIS

¶ 27     On appeal, the Village contends that the trial court erred in finding its suit to be time-barred for two reasons. First, the Village argues that Barclay is equitably estopped from raising the statute of limitations because of certain alleged misrepresentations it made to convince the Village to forbear from suit. Second, in the alternative, the Village argues that the statute of limitations was tolled by Barclay's fraudulent concealment of the action.

¶ 28     In considering these contentions, we are mindful that summary judgment is appropriate if, "when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002) (citing 735 ILCS 5/2-1005(c) (West 2006)). It should only be granted where the movant's right to judgment is clear and free from doubt. *Reed v. Bascon*, 124 Ill. 2d 386, 393 (1988). Accordingly, the evidence should be construed strictly against the movant (*Reed*, 124 Ill. 2d at 393), and where fair-minded persons could draw different inferences from the facts, summary judgment should not be granted (*In re Estate of Roeseler*, 287 Ill. App. 3d 1003, 1013 (1997)). We review the trial court's entry of summary judgment *de novo*. *General Casualty Insurance Co.*, 199 Ill.

2d at 284.

¶ 29                                     A. Waiver of Fraud Counts

¶ 30        Before we reach the Village's arguments for reversal, we must first deal with a threshold issue raised by Barclay. Barclay argues that when the trial court granted summary judgment with respect to the fraud counts in the Village's complaint, it did so on the merits. Therefore, according to Barclay, by failing to argue those merits in its brief, the Village has waived this issue. The Village, on the other hand, contends that the trial court's grant of summary judgment was entirely based on the statute of limitations and did not reach the merits.

¶ 31        Based upon our review of the record, we agree with the Village. At the hearing on Barclay's summary judgment motion on September 12, 2011, the discussion was entirely focused upon whether Barclay was equitably estopped from raising the statute of limitations as a defense. Neither the parties' counsel nor the trial judge engaged in any substantive discussion regarding the fraud counts in the Village's complaint. Indeed, the trial court explicitly based its grant of summary judgment upon its finding that the Village "should have pursued the architect and could have pursued the architect well before the statute of limitations expired."

¶ 32        Barclay's argument on this issue relies upon a statement made by the court during the hearing on the Village's motion for reconsideration. Near the beginning of that hearing, the following colloquy occurred:

> "THE COURT: My recollection is I didn't think there was sufficient evidence to go forward on a fraud count against Barclay.
>
> MR. WALL [counsel for the Village]: We understood your ruling to be that you were dismissing our contract claim also. And his argument was, well, that was not brought within the statute of limitations and our response that was he was equitably estopped from asserting statute of limitations.
>
> THE COURT: So, in other words, all counts would be covered by the statute of limitations?
>
> MR. WALL: Exactly."

Barclay points to the trial court's initial statement as evidence that it did, indeed, rule upon the merits of the Village's fraud counts. However, it is apparent in context that the trial judge simply misremembered his prior ruling and was corrected by counsel for the Village. Notably, counsel for Barclay made no objection to opposing counsel's characterization of the trial court's ruling. The trial court acknowledged its error later in the hearing when it stated, "So the issue in this case was whether the Village timely brought its action in a timely manner." In addition, when the court made its final decision to deny the Village's motion for reconsideration, it referred only to the issue of whether Barclay was equitably estopped from raising the statute of limitations. Accordingly, it is apparent from the record that the trial court's ruling was not based upon on the merits of the Village's action, but solely upon the statute of limitations.

B. Equitable Estoppel

¶ 34     Thus, we proceed to consider the Village's claims of error. The Village first contends that Barclay is equitably estopped from raising the statute of limitations because it issued misrepresentations intended to keep the Village from discovering that it had a cause of action against Barclay, and because Barclay lulled the Village into complacency by undertaking responsibility for remedial measures.

¶ 35     Equitable estoppel occurs where a party is barred from asserting certain rights because of conduct which the other party relied upon in good faith and was thereby led to change its position for the worse. *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001). In order to establish equitable estoppel, a party must show the following:

> "(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Id.* at 313-14.

¶ 36     A plaintiff claiming estoppel must have had no knowledge or means of discovering the true facts within the period of limitations. *Nickels v. Reid*, 277 Ill. App. 3d 849, 856 (1996) (defendant was not equitably estopped from asserting the statute of limitations where plaintiff could have discovered his cause of action against the defendant within the period of limitations through the exercise of reasonable diligence). As our supreme court has stated, "A party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." *Vail v. Northwestern Mutual Life Insurance Co.*, 192 Ill. 567, 570 (1901).

¶ 37     The Village first argues that Barclay is equitably estopped from raising the statute of limitations because it misrepresented that Riemer was the cause of the problems with the community center, thereby keeping the Village from discovering its cause of action against Barclay. In response, Barclay raises two arguments. First, it argues that Article 9.3 of the contract between Barclay and the Village precludes application of the discovery rule. Therefore, it contends, equitable estoppel cannot be premised upon conduct that delays discovery of the wrongful cause of an injury. Second, Barclay argues that the Village had sufficient information to pursue a cause of action against Barclay within the period of limitations, and given the state of its knowledge, it was not reasonable for it to rely upon Barclay's representations to forbear from bringing suit.

¶ 38     With regard to Barclay's first argument, we agree that the discovery rule does not apply to the instant action. Article 9.3 of the contract between the parties provides:

> "Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or

failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate of Payment for acts or failures to act occurring after Substantial Completion."

The plain language of this section provides that the period of limitations will expire in a fixed time frame from the date of substantial completion, regardless of whether the complained-of injury was discovered or even discoverable within that time period. See *Federal Insurance Co. v. Konstant Architecture Planning, Inc.*, 388 Ill. App. 3d 122, 128 (2009) (Article 9.3 is controlling with respect to the accrual date of the statute of limitations and precludes application of the discovery rule); *Gustine Uniontown Associates, Ltd. v. Anthony Crane Rental, Inc.*, 892 A.2d 830, 836 (Pa. Super. Ct. 2006) (the "obvious intent" of Article 9.3 is to "preclude[ ] application of the discovery rule"). Thus, the practical effect of Article 9.3 is to transform the statute of limitations into a statute of repose. See *Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 422 (1986) (statute of repose bars action after a defined period of time regardless of plaintiff's knowledge or lack of knowledge of his cause of action); *Goodman v. Harbor Market, Ltd.*, 278 Ill. App. 3d 684, 691 (1995) (discovery rule is not applicable to statutes of repose).

¶ 39     However, Barclay presents no law in support of the proposition that the inapplicability of the discovery rule prevents plaintiffs from asserting equitable estoppel based upon concealment of a cause of action. Indeed, the sole authority that Barclay cites on this point is *Federal Insurance Co.*, 388 Ill. App. 3d at 128, in which the court discusses Article 9.3 generally but makes no mention of equitable estoppel.

¶ 40     Moreover, Illinois case law dealing with statutes of repose shows that, even where the discovery rule is not in effect, equitable estoppel may still apply in cases where a defendant makes misrepresentations that delay discovery of a cause of action. In *Hester v. Diaz*, 346 Ill. App. 3d 550, 551 (2004), plaintiff retained defendants to represent her in connection with a workers' compensation claim. When plaintiff's case was called for hearing, no one appeared on her behalf, so the case was dismissed for want of prosecution. *Id.* at 551. However, defendants failed to inform the plaintiff that her case had been dismissed; in fact, for the next seven years, they reassured her that her case was proceeding as it should. *Id.* at 556. Under these facts, the trial court dismissed plaintiff's legal malpractice suit pursuant to the six-year statute of repose for legal malpractice actions. On appeal, plaintiff argued that the defendants were equitably estopped from raising the statute of repose. *Id.* at 555. Although the *Hester* court acknowledged that the statute of repose is not tied in any way to the date of discovery of a cause of action, it nevertheless held that plaintiff was entitled to raise the issue of equitable estoppel, and it reversed the trial court's dismissal of her case. *Id.* at 554, 556; *cf. Wisniewski v. Diocese of Belleville*, 406 Ill. App. 3d 1119, 1151 (2011) ("Although a statute of repose does not normally incorporate the discovery rule, a statute of repose, nonetheless, can be tolled if a plaintiff does not discover his claim due to fraudulent concealment on the part of the defendant."). Thus, contrary to Barclay's assertions, the existence of Article 9.3 and the inapplicability of the discovery rule do not automatically preclude the application of equitable estoppel.

¶ 41     Barclay's next argument is that, under the facts of this case, the Village had sufficient information to pursue a cause of action against Barclay within the period of limitations.

Specifically, it knew that the problems with the building were caused by improper excavation for which Barclay was at least partly responsible. Given this information, Barclay argues that the Village's reliance upon Barclay's assertions that Riemer was at fault was not reasonable, as would be required for equitable estoppel.

¶ 42    We agree with Barclay. According to the testimony of the Village's employees, the Village was aware of the following facts within the period of limitations: A 1999 report from TSC indicated the presence of peat at the project site. Barclay's original plan called for removal of all of the peat. Pursuant to Barclay's plan, the bid for the excavation job stated that six feet of soil needed to be removed. However, Riemer did not actually excavate to this depth. Ennesser, the Village's building commissioner, personally observed that the hole in the ground was not as deep as he expected. Barclay not only knew about this deviation from the original bid specifications, but it authorized the deviation. In fact, Village manager Daly insisted upon obtaining Barclay's approval before proceeding with filling and compacting. Moreover, on March 19, 2003, TSC sent a report to the Village in which it opined that the floor of the building was settling because "the floor slab is floated over the underlying *unsuitable soils.*" (Emphasis added.) Based upon all of this information, a reasonable party in the Village's position would have been put on notice that the likely cause of the problem was inadequate excavation of peat, which Barclay had approved.

¶ 43    Notwithstanding all of the foregoing evidence, the Village argues that it was entitled to rely upon Barclay's assertions that Riemer was to blame. The Village cites multiple occasions on which Barclay made such assertions. Bilina, the director of the Village's department of recreation, testified that approximately six to eight months after substantial completion, he consulted Barclay regarding the sinking floor, and Barclay told him that "it was the compaction." On March 2, 2005, Barclay sent the Village a letter in which it again opined that "the compaction of such earthwork and filling was not done correctly." Finally, on December 10, 2005, Barclay's retained structural engineer, Donovan, stated that "The job specifications required existing sub-grade to be tested, then compacted or removed and replaced, if necessary. *** I have not been able to find any evidence that this was done."

¶ 44    However, for the Village to have relied upon Barclay's assertions, it would have had to turn a blind eye to the mounting evidence that Barclay authorized an inadequate excavation of the project site. As noted, a party claiming the benefit of equitable estoppel may not shut its eyes to the facts and then charge its ignorance to others. *Vail*, 192 Ill. at 570. In addition, we note that Donovan's December 2005 letter was sent after the period of limitations had expired, so it could not have influenced the Village's decision not to bring suit against Barclay within the limitations period.

¶ 45    The Village's second major argument is that Barclay should be estopped from raising the statute of limitations because it lulled the Village into complacency by undertaking responsibility for remedial measures until the period of limitations had ended. In support, the Village relies upon *Axia Inc. v. I.C. Harbour Construction Co.*, 150 Ill. App. 3d 645 (1986), and *Senior Housing, Inc. v. Nakawatase, Rutkowski, Wyns & Yi, Inc.*, 192 Ill. App. 3d 766 (1989).

¶ 46    In *Axia*, 150 Ill. App. 3d at 648, plaintiff hired the defendant contractor for the

construction of an office building. Within a year of its completion, plaintiff notified the defendant of water leakage and powder deposits on the surface of the building. *Id.* at 655. Over the next four years, the defendant engaged in a continuing course of conduct to repair the problems with the building. *Id.* Eventually, negotiations between the parties broke down, and plaintiff brought suit against the defendant. Under those facts, the *Axia* court found that defendant was equitably estopped from raising the statute of limitations, since plaintiff forbore from suit in reliance upon defendant's conduct in correcting the problems. *Id.* at 656. The court explained, "[Defendant] was not merely engaging in negotiation and investigation of the problems, but took affirmative steps to remedy the matters in apparent acknowledgement of its responsibility under the contract." *Id.*

¶ 47    Similarly, in *Senior Housing*, 192 Ill. App. 3d at 773, the court applied equitable estoppel based upon the defendant architect's remedial measures which lulled the plaintiff into forbearing from suit before the expiration of the statute of limitations. Plaintiff had hired the defendant to develop a housing center, which developed moisture problems shortly after completion. *Id.* at 768. The defendant "was responsible for and took responsibility to direct the repair work," instructing contractors on multiple occasions as to what remedial steps to take and when. *Id.* at 772. The *Senior Housing* court explicitly held that the defendant "did much more than merely investigate." *Id.* at 773. Thus, citing *Axia*, the *Senior Housing* court found that the defendant was estopped from asserting the statute of limitations as a bar to plaintiff's recovery.

¶ 48    The Village argues that the instant case is analogous to *Axia* and *Senior Housing*. We find this argument unpersuasive. Although Barclay called for various tests to be performed on the project site, it did not take an active role in remediation, unlike the defendants in *Axia* and *Senior Housing*. The record does not reflect that Barclay took any affirmative steps to remedy the sinking floor. Therefore, the Village was not entitled to rely upon Barclay's actions in this regard to forbear from bringing suit against Barclay, and Barclay is not equitably estopped from raising the statute of limitations.

¶ 49                                C. Fraudulent Concealment

¶ 50    The Village next contends that Barclay fraudulently concealed the cause of action by misrepresenting to the Village that Riemer was to blame for the problems with the community center. According to the Village, this fraudulent concealment serves to toll the statute of limitations pursuant to section 13-215 of the Code of Civil Procedure, which provides:

> "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled hereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2010).

See *DeLuna v. Burciaga*, 223 Ill. 2d 49, 67-68 (2006) (section 13-215 operates as a tolling provision for both statutes of limitations and statutes of repose).

¶ 51    A plaintiff seeking to avail itself of this provision to toll the statute of limitations must show that the defendant engaged in affirmative acts or representations designed to prevent

discovery of the cause of action or to induce the plaintiff into delaying the filing of its claim. *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 675 (1997). However, Illinois courts have declined to apply section 13-215 to toll the statute of limitations where " 'the claimant discovers the fraudulent concealment, or should have discovered it through ordinary diligence, and a reasonable time remains within the remaining limitations period.' " *Turner v. Nama*, 294 Ill. App. 3d 19, 27 (1997) (quoting *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 862 (1987)); see *Witt v. Jones & Jones Law Offices, P.C.*, 269 Ill. App. 3d 540, 544-45 (1995) (plaintiffs could not avail themselves of fraudulent concealment doctrine where, notwithstanding the possibility of fraudulent concealment, plaintiffs had knowledge of their cause of action within the statutory time frame). In the present case, as has been discussed, the Village knew or should have known within the period of limitations that the problems with the community center were caused by inadequate excavation which was authorized by Barclay. Therefore, even if Barclay had taken action that would otherwise constitute fraudulent concealment, the Village would not be able to avail itself of the tolling provision in section 13-215. *Turner*, 294 Ill. App. 3d at 27; *Witt*, 269 Ill. App. 3d at 544-45.

¶ 52    The Village nevertheless argues that Barclay occupied a relation of confidence to the Village, such that Barclay was required to disclose all relevant facts regarding the project to the Village, and Barclay's failure to do so constitutes fraudulent concealment in and of itself. In support, the Village cites *Hagney v. Lopeman*, 147 Ill. 2d 458, 463 (1992), in which the court states:

> "It is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act; and that mere silence on his part as to a cause of action, the facts giving rise to which it was his duty to disclose, amounts to a fraudulent concealment ***." (Internal quotation marks omitted.)

See also *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996) (stating that "a duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff"); *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 561-63 (1980) (silence of city alderman regarding bribery scheme constituted fraudulent concealment, since alderman was a fiduciary of the plaintiff city).

¶ 53    However, upon the facts of the present case, we find that there is no evidence to show that the relationship between the parties was anything but an arm's-length contractual relationship. In this regard, we find the case of *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill. App. 3d 233 (1979), to be instructive. In that case, the court stated:

> "Plaintiffs allege they trusted Benchmark and that that trust, plus the dominant position Benchmark occupied in their business relationships because it was the general

contractor, operated to create a confidential relationship. We cannot agree. *The parties herein were all businesses, theoretically operating at arm's length, and their relationship was governed according to contracts made between them. Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.* A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another. We do not say that businesses linked by contract can never be found to be parties in a confidential relationship, but mere allegations that one businessman simply trusted another to fulfill his contractual obligations is certainly not enough. If we were to hold otherwise, most contracting parties might well be found to be in this type of confidential relationship." (Emphasis added.) *Id.* at 238.

See also *Teachers Insurance & Annuity Ass'n of America v. La Salle National Bank*, 295 Ill. App. 3d 61, 71 (1998) (normal trust between contracting parties does not, by itself, turn a formal contractual relationship into a fiduciary relationship).

¶ 54 Similarly, in the present case, the parties were theoretically operating at arm's length pursuant to a contractual agreement. The Village nevertheless argues that the testimony of Village employees shows that the Village placed trust and confidence in Barclay. For instance, the Village's building commissioner Ennesser testified that although he was aware that less soil was excavated than originally planned, "I just let it go because I assumed [Barclay's architect] was the man in control and knew what he was doing, and I kind of put my faith into him, so...." Likewise, Village manager Daly testified that he trusted Barclay's opinion with regard to the problems with the building. However, as stated in *Carey Electric*, mere allegations that the Village trusted Barclay to fulfill its contractual obligations are insufficient to transform their relationship into one of confidence. *Carey Electric*, 74 Ill. App. 3d at 238; see *Teachers Insurance*, 295 Ill. App. 3d at 71.

¶ 55 Accordingly, the trial court was correct in granting summary judgment in favor of Barclay on this issue. See *Bosak v. McDonough*, 192 Ill. App. 3d 799, 806 (1989) (summary judgment for defendant was proper where the undisputed facts, and the disputed facts read in the light most favorable to plaintiff, did not provide clear and convincing evidence of the existence of a fiduciary relationship).

¶ 56 Therefore, for the foregoing reasons, we affirm the judgment of the trial court.

¶ 57 Affirmed.