2020 IL App (1st) 190849-U

No. 1-19-0849

Order filed May 13, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOSEPH ISENBERGH, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 11638 |
| | ) | |
| SOUTH CHICAGO NISSAN, | ) | Honorables |
| | ) | John C. Griffin and |
| Defendant-Appellee. | ) | Daniel J. Kubasiak, |
| | ) | Judges, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Ellis and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court did not err in dismissing plaintiff's claim of promissory estoppel or in subsequently granting summary judgment for defendant on plaintiff's claims of fraud, equitable estoppel, and various statutory violations.

¶ 2    Plaintiff-appellant, Joseph Isenbergh, appeals from two separate orders of the circuit court

in his suit against defendant-appellee, South Chicago Nissan (South Chicago).[1] First, plaintiff

_____

[1] South Chicago is apparently now doing business as Western Avenue Nissan.

argues that the circuit court erred in dismissing his claim of promissory estoppel as barred by the Statute of Frauds. Second, he contends that the court later erroneously denied him summary judgment on his other claims and instead granted summary judgment in favor of South Chicago. For the following reasons, we affirm the circuit court's judgments.

¶ 3                                    I. BACKGROUND

¶ 4      On January 10, 2008, plaintiff visited South Chicago, an automobile dealership, seeking to purchase a new 2008 Nissan Versa with a manual transmission, anti-lock brakes, and certain other features (referred to by plaintiff as "the Permanent Car"). Employees at the dealership informed plaintiff that they had no such vehicle in stock but could order one for delivery within 60 days. Plaintiff agreed, and because he needed a vehicle while he waited for the Permanent Car to be delivered, he inquired whether he could also rent or purchase a used car from the dealership's stock in the "$4,000 to $5,000 price range." According to plaintiff, South Chicago employees countered with an offer to sell him a second new Versa (which plaintiff refers to as "the Temporary Car") and then buy it back for slightly less than the sale price once the Permanent Car arrived. Per the terms of this alleged arrangement, plaintiff was to pay $550 a month for the Temporary Car while awaiting delivery of the Permanent Car, and then sell the Temporary Car back to South Chicago at a "formula price" that would limit his out-of-pocket costs to no more than two of the monthly payments. Based on South Chicago's alleged representations, plaintiff believed he would save approximately $4000 by purchasing and trading in the Temporary Car instead of purchasing a $5000 used car that would lose any trade in value by the time the Permanent Car arrived. South Chicago admits selling plaintiff the Temporary Car but denies promising to repurchase it for the price plaintiff claims.

¶ 5     What is certain, though, is that plaintiff read, understood, and signed a retail installment contract for the Temporary Car that listed the "Cash Price" as $26, 141.00. After accounting for a trade-in allowance, a down payment, and various itemized taxes and fees, the "Amount Financed" was calculated as $28,115.19. The contract also identified a total "Finance Charge" of $11,647.53 based on an annual percentage rate of 11.99 %. Thus, the "Total of Payments" was $39,762.72, which was to be paid in 72 monthly payments of $552.26. Neither the contract itself nor any of the associated documents reviewed and signed by plaintiff make any mention of South Chicago's alleged promise to repurchase the Temporary Car. Instead, the retail order expressly provided that "no other agreement of any kind, verbal understanding, or promise will be recognized" in connection with the purchase of the Temporary Car. Similarly, the "WE OWE" agreement stated that South Chicago owed plaintiff "NOTHING," and that plaintiff "accept[ed] this WE OWE with the understanding that ALL promises that are owed to [him] regarding [the] transaction are in writing." (Capitalizations in original). The contract was later assigned to AmeriCredit, a finance company.

¶ 6     In May 2008, plaintiff returned to South Chicago to pick up the Permanent Car and trade in the Temporary Car. When South Chicago refused to purchase the Temporary Car for the price plaintiff claims they had agreed, plaintiff threatened legal action. He also later notified AmeriCredit of the dispute and that he would cease making the monthly payments for the Temporary Car. In all, plaintiff made five payments totaling $2761.30 before relinquishing possession of the Temporary Car to AmeriCredit in April 2010.

¶ 7     Plaintiff filed his original complaint against South Chicago on July 24, 2008. On April 7, 2009, after AmeriCredit sued plaintiff for the balance due under the Temporary Car contract,

plaintiff added AmeriCredit as a second defendant. AmeriCredit filed a counterclaim against plaintiff seeking the payments due under the Temporary Car contract and possession of the Temporary Car. AmeriCredit also filed a crossclaim against South Chicago, asserting that South Chicago breached the dealership agreement between AmeriCredit and South Chicago by failing to defend or indemnify AmeriCredit against plaintiff's claims. In April 2010, AmeriCredit reached a settlement agreement with plaintiff which disposed of its counterclaim and of plaintiff's claims against AmeriCredit. AmeriCredit was also awarded a default judgment against South Chicago on the crossclaim. AmeriCredit was thereafter no longer a party to the litigation, and it is not a party to this appeal.

¶ 8 On April 27, 2015, plaintiff filed a six-count, fifth amended complaint against South Chicago alleging common law fraud (count I), statutory fraud under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1, *et seq.* (West 2010)) (count II), violations of the Motor Vehicle Retail Installment Sales Act (MVRISA) (815 ILCS 375/1, *et seq.*(West 2010)) (count III), violations of the federal Truth in Lending Act (TILA) (15 USC § 1601 (West 2010)) (count IV), breach of contract (count V), and promissory estoppel (count VI). Plaintiff requested compensatory, statutory, and punitive damages.

¶ 9 On May 28, 2015, South Chicago filed a combined motion to dismiss the fifth amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)). The motion sought (1) the dismissal of counts I through IV under section 2-615 of the Code for failure to state causes of action and (2) the dismissal of count V under section 2-619 of the Code because the purported oral promise to buy back the Temporary Car was not in writing and thus unenforceable under the Statute of Frauds. The circuit court originally denied South

Chicago's motion, but later granted its motion to reconsider with respect to count V only. Consequently, the court dismissed plaintiff's breach of contract claim as barred by the Statute of Frauds. The court denied plaintiff's motion to reconsider that dismissal, plaintiff appealed, and this court affirmed. *Isenbergh v. South Chicago Nissan*, 2016 IL App (1st) 153510 (unpublished order under Illinois Supreme Court Rule 23).

¶ 10    On December 1, 2015, shortly before plaintiff appealed the dismissal of his breach of contract claim, he requested and was granted leave to voluntarily dismiss his remaining claims without prejudice. After losing his appeal, plaintiff re-filed his complaint (without the breach of contract claim) in the circuit court on November 11, 2016. He amended that complaint in May 2017, though the amended complaint is substantively identical to its predecessor.

¶ 11    On August 3, 2017, South Chicago filed a motion to dismiss the promissory estoppel claim from the amended complaint, arguing that, like plaintiff's previously dismissed breach of contract claim, it was barred by the Statute of Frauds. In response, plaintiff contended that in *Newton v. Kubota*, 233 Ill. 2d 46 (2009), our supreme court implicitly recognized that "the Statute of Frauds ha[s] no bearing on a freestanding claim of promissory estoppel in a complaint in which there was *no* claim of breach of contract." (Emphasis in original.). Following a hearing on September 25, 2017, the transcript of which does not appear in the record on appeal, the circuit court granted South Chicago's motion. The court also later denied plaintiff's motion to reconsider, stating that *Dickens v. Quincy College Corp.*, 245 Ill. App. 3d 1055 (1993), "expressly found that the promissory estoppel doctrine is not an exception to the Statute of Frauds."

¶ 12    On January 1, 2018, plaintiff filed a second amended complaint, this time adding a claim of equitable estoppel in substitution for his dismissed claim of promissory estoppel. The equitable

estoppel claim was based on two alleged misrepresentations: (1) South's Chicago oral promise to buy back the Temporary Car for around $1100 less than he paid for it, and (2) South Chicago's removal of the manufacturer's suggested retail price (MSRP) sticker from the Temporary Car to conceal that the price on the installment contract was significantly higher than the sticker price. South Chicago moved to dismiss the equitable estoppel claim, contending that equitable estoppel was inapplicable because plaintiff alleged only misrepresentations of future facts. The circuit court granted South Chicago's motion with respect to the buy-back promise, but denied the motion with respect to the removal of MSRP sticker because that allegation involved a misrepresentation of a currently existing fact.

¶ 13    On August 17, 2018, plaintiff filed a motion for leave to file a third amended complaint that would have re-asserted his claim of promissory estoppel. However, the circuit court denied leave, stating that a third amended complaint would have been the tenth iteration of plaintiff's claims throughout the course of the litigation and that "allowing yet another opportunity to file an amended complaint would neither be necessary nor productive" as plaintiff "had several opportunities to fully present his claims."

¶ 14    The parties then filed cross motions for summary judgment on January 10, 2019. Plaintiff argued that he was entitled to summary judgment on four of his five claims (all but equitable estoppel) due to the preclusive effect of AmeriCredit's default judgment against South Chicago for breach of their dealer agreement. Plaintiff also contended that he had proved violations of the TILA and MVRISA independent of the preclusive effect of the AmeriCredit judgment. In particular, plaintiff maintained that South Chicago violated the disclosure requirements of both statutes by (1) failing to disclose that the contract price for the Temporary Car exceeded the MSRP,

and (2) consequently failing to disclose the actual "finance charge," *i.e.* the difference between the price as financed and the MSRP. Plaintiff also asserted that the Temporary Car contract violated the MVRISA for various other reasons, including because it was not signed by South Chicago, "not completed as to all essential provisions" before being signed by plaintiff, and falsely indicated that plaintiff made a $750 down payment.

¶ 15    South Chicago's motion for summary judgment argued that: (1) plaintiff's fraud and equitable estoppel claims failed because he did not prove actual damages or reasonable reliance on the alleged buy-back promise, (2) plaintiff's MVRISA claim failed because that statute does not authorize a private right of action, and (3) plaintiff's TILA claim failed because the Temporary Car contract listed the required disclosures.

¶ 16    On March 29, 2019, the circuit court entered a written order granting summary judgment for South Chicago on all counts. Therein, the court found that the AmeriCredit judgment did not entitle plaintiff to summary judgment on the basis of collateral estoppel or law of the case doctrine, and that South Chicago's alleged misconduct was not actionable fraud because plaintiff did not suffer damages and any reliance on the alleged misrepresentations was unreasonable. The court further found that the Temporary Car contract listed all the disclosures required under the TILA and MVRISA.

¶ 17    On April 22, 2019, plaintiff filed a notice of appeal challenging both the circuit court's September 2017 order dismissing his promissory estoppel claim and the court's March 2019 order granting summary judgment in favor of South Chicago.

¶ 18                                II. ANALYSIS

¶ 19                              A. Promissory Estoppel

¶ 20 On appeal, plaintiff first argues that the circuit court erred by finding his claim of promissory estoppel was barred by the Statute of Frauds. As a threshold matter, South Chicago argues that plaintiff has waived review of the promissory estoppel claim by filing a subsequent complaint that did not include, reference, or incorporate that claim. In response, plaintiff states only that South Chicago is "wrong" about the waiver, and explains that he did not include the promissory estoppel claim in his second amended complaint because the circuit court had already dismissed the claim and "would undoubtedly have dismissed it again on motion by South Chicago." Thus, plaintiff concludes—without any citation to authority—that we may properly review the circuit court's dismissal of the claim.

¶ 21 However, the rules governing the preservation of dismissed claims for appeal are "clear and well settled." *Bonhomme v. St. James*, 2012 IL 112393, ¶ 17. Our supreme court has consistently held that "a party who files an amended pleading waives any objection to the trial court's ruling on the former complaints." *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 153 (1983). Furthermore, " '[w]here an amendment is complete in itself and does not refer to or adopt the prior pleading, the earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn.' " *Id.* at 154 (quoting *Bowman v. County of Lake*, 29 Ill. 2d 268, 272 (1963)). Whether a dismissed claim has been preserved for appellate review is a question of law that we review *de novo*. *Bonhomme*, 2012 IL 112393, ¶ 17.

¶ 22 Here, plaintiff's claim of promissory estoppel last appeared in his first amended complaint after the case was voluntarily dismissed and re-filed. Plaintiff subsequently filed a second amended complaint in the re-filed action, which was "complete in itself" and "[did] not refer to or adopt" the promissory estoppel claim in any way. As such, he has effectively abandoned and withdrawn

the claim, and "our consideration of the trial court's dismissal of that claim is eliminated from this appeal." *Rubin and Norris, LLC v. Panzarella*, 2016 IL App (1st) 141315, ¶ 34.

¶ 23                          B. Cross Motions for Summary Judgment

¶ 24     That leaves the circuit court's ruling on the parties' cross motions for summary judgment. By filing cross motions for summary judgment, the parties "agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The purpose of summary judgment is not to try issues of fact, but to determine whether a triable issue of fact exists. *Barrett v. FA Group*, LLC, 2017 IL App (1st) 170168, ¶ 26. Summary judgment is appropriate only if the pleadings and record show that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15. In determining whether to grant a party's motion for summary judgment, the court must construe the pleadings and evidentiary materials in the light most favorable to the nonmoving party. *Haslett v. United Skates of America, Inc.*, 2019 IL App (1st) 181337, ¶ 38. A trial court's entry of summary judgment is reviewed *de novo* (*Seymour v. Collins*, 2015 IL 118432, ¶ 42), and we may affirm an order of summary judgment on any basis appearing in the record (*Epple v. LQ Management, LLC*, 2019 IL App (1st) 180853, ¶ 15).

¶ 25     As noted, plaintiff's second amended complaint, which is operative here, raised five claims: common law fraud (count I), equitable estoppel (count II), and violations of the Consumer Fraud Act (count III), the MVRISA (count IV), and the TILA (count V). Plaintiff challenges the grant of summary judgment with respect to each count.

¶ 26                          1. Preclusion

¶ 27 As he did in the circuit court, plaintiff first contends that he was entitled to summary judgment on counts I, III, IV, and V of the second amended complaint due to the preclusive effect of AmeriCredit's default judgment against South Chicago for violations of their dealer agreement. In particular, plaintiff contends that the AmeriCredit judgment establishes his claims based on the doctrines of (1) the law of the case and (2) collateral estoppel.

¶ 28                                a. Law of the Case

¶ 29 The law of the case doctrine "generally bars relitigation of an issue previously decided in the same case." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 2012 IL App (2d) 100024, ¶ 31. The doctrine is typically invoked to make questions decided on appeal binding on remand and in subsequent appeals in the same case. See *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 23 (holding that the law of the case doctrine did not apply where the relevant issues had not been decided on an appeal). The purposes of the doctrine are to avoid indefinite relitigation of the same issues, promote consistent results within the same case, and ensure that lower courts follow the decisions of appellate courts. *In re Christopher K.*, 217 Ill. 2d 348, 365 (2005). Notably, while the doctrine "express[es] the practice of courts generally to decline to reopen what has been decided," it does limit a court's jurisdictional power to address an issue. *Id.* Application of the law of the case doctrine is a question of law, which we review *de novo*. *Rommel v. Illinois State Toll Highway Authority*, 2013 IL App (2d) 120273, ¶ 15.

¶ 30 Plaintiff's law of the case argument turns on his contention that the AmeriCredit judgment established that the Temporary Car contract "was *not* free from fraud and misrepresentations" and that "South Chicago did *not* comply with federal and state laws ***." (Emphases in original). A review of the record, however, reveals that the circuit court made no such findings. AmeriCredit's

crossclaim explained that, upon being added as a defendant in the present litigation, it sent a letter to South Chicago demanding that South Chicago defend and indemnify it against plaintiff's claims as provided for in their dealer agreement. However, South Chicago did not respond to the demand letter, nor did it defend or indemnify AmeriCredit as requested. Consequently, AmeriCredit's cross claim raised a single count of breach of contract in that South Chicago had violated paragraphs 6(A), 6(C), 7.A., and 8.B. of the dealer agreement.

¶ 31 Paragraphs 6(A) and 6(C) of the agreement collectively state that South Chicago's contracts with customers will be "legitimate, valid, and binding in accordance with their terms," "legally enforceable by AMERICREDIT," "free from fraud," "in compliance with all applicable federal and state laws," and "subject to no defenses, claims, misrepresentation, setoffs or counterclaims of any kind." Paragraph 6(A) further warrants that "no suit or legal action or proceeding has been brought or threatened to be brought" against South Chicago. Similarly, paragraph 7.A. states that South Chicago "agrees to defend, indemnify, save and hold AMERICREDIT harmless" in connection with any "lawsuit which may be directed to AMERICREDIT or to which AMERICREDIT may be made a party" arising from the sale or lease of a vehicle. Finally, paragraph 8.B. provides that, upon a breach of the dealer agreement, South Chicago will repurchase the contract in question, reimburse AmeriCredit for costs associated with the breach, and indemnify AmeriCredit from claims arising from the breach. As such, AmeriCredit's crossclaim requested that the court order South Chicago to purchase the Temporary Car contract for $28,752.62 (the unpaid amount) with interest and attorney's fees.

¶ 32    After finding South Chicago in default, the circuit court entered an order stating that AmeriCredit had "established its liquidated damages and entitlement to the relief requested in the Cross-Claim." Consequently, the court awarded AmeriCredit $32,718.90 plus costs.

¶ 33    Plaintiff focuses on the portions of the dealer agreement stating that South Chicago would form contracts that are "free from fraud" and "in compliance with all applicable federal and state laws." From this language, he concludes that the default judgment against South Chicago necessarily means that the court found the Temporary Car contract not "free from fraud" and not "in compliance with all applicable federal and state laws." This conclusion is not logically sound. Nor are we persuaded by plaintiff's argument, apparently in the alternative, that "[i]t remains to be established what the scope of the AmeriCredit Judgment was." Instead, the clear thrust of AmeriCredit's crossclaim was South Chicago's undisputed failure to defend or indemnify it as required by the dealer agreement. Thus, any law of the case established in the AmeriCredit judgment is wholly irrelevant to plaintiff's claims.

¶ 34                                    b. Collateral Estoppel

¶ 35    Plaintiff also argues that the AmeriCredit judgment has preclusive effect under the doctrine of collateral estoppel. Similar to the law of the case doctrine, collateral estoppel is an equitable doctrine that may be invoked to promote fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions. Collateral estoppel is applicable only if three requirements are met: (1) the issue decided in a prior adjudication is identical with the one presented in the current suit, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was also a party to the prior adjudication. *Hurlbert v. Charles*, 238 Ill. 2d 248, 255 (2010). The doctrine must be applied

narrowly to "fit the precise facts and issues that were clearly determined in the prior judgment." *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 391 (2001). We review the applicability of collateral estoppel *de novo*. *State Building Venture v. O'Donnell*, 239 Ill. 2d 151, 158 (2010).

¶ 36    Here, plaintiff's collateral estoppel argument fails for the same reason as his law of the case argument. Even assuming, *arguendo*, that the AmeriCredit judgment was a "final judgment on the merits" in a "prior adjudication" for purposes of collateral estoppel, the doctrine would still not apply because the issues raised in plaintiffs' claims are not identical to those decided by the AmeriCredit judgment. As such, collateral estoppel is inapplicable, and the circuit court did not err in failing to grant plaintiff summary judgment based on preclusion.

¶ 37                                  2. Fraud

¶ 38    Plaintiff next argues that he was entitled to summary judgment on his fraud claims independently of any preclusive effect of the AmeriCredit judgment. As noted, plaintiff's second amended complaint raised both common law fraud and statutory fraud under the Consumer Fraud Act.

¶ 39    To state a claim of common law fraud, a plaintiff must allege that: (1) the defendant made a false statement of material fact, (2) the defendant knew the statement was false, (3) the defendant intended the statement to induce the plaintiff's action, (4) the plaintiff acted in reasonable reliance on the truth of the statement, and (5) the plaintiff suffered actual damages as a result. *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496 (1996).

¶ 40    Statutory fraud, on the other hand, requires a plaintiff to show that: (1) the defendant engaged in a deceptive act or practice, (2) the defendant intended the plaintiff to rely on the deception, (3) the deception occurred in the course of trade or commerce, and (4) the plaintiff

suffered actual damages as a proximate result of the deception. *Mulligan v. QVC, Inc.*, 382 Ill. App. 3d 620, 625 (2008). Both theories of fraud require the plaintiff to plead and prove actual damages as a result of the alleged misconduct. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 652 (2001).

¶ 41     Here, plaintiff claims that he was fraudulently induced into the Temporary Car contract by South Chicago's misrepresentations. However, as the circuit court correctly found, the fundamental flaw in plaintiff's fraud claims is that he cannot establish actual damages as a result of purchasing the Temporary Car. According to plaintiff's complaint, but for South Chicago's allegedly fraudulent inducement, he would have purchased "a $5,000 used car that would lose all its value while he waited for delivery of the Permanent Car." Yet plaintiff alleged that he only spent $3561.30 ($2761.30 in Temporary Car payments and $800 in travel costs to and from court to defend against AmeriCredit's claims) as a result of South Chicago's misrepresentations while maintaining possession of the Temporary Car for 27 months. Although plaintiff also claimed consequential damages of "at least $22,000," this amount is not reflective of actual damages because it merely represented what plaintiff says it "would have cost" to retain an attorney to defend him against AmeriCredit. However, as plaintiff represented himself throughout those proceedings, he did not actually incur any attorney's fees as a result of AmeriCredit's claims. Plaintiff therefore did not plead actual damages and the circuit court did not err in granting summary judgment to South Chicago on plaintiff's fraud claims.

¶ 42                                    3.The Truth in Lending Act

¶ 43     Plaintiff further contends that the circuit court erroneously rejected his claim that South Chicago did not make the disclosures required under the TILA. The TILA "is not a general

prohibition of fraud in consumer transactions or even in consumer credit transactions." *Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 285 (7th Cir. 1997). Rather, the TILA was enacted simply to "assure a meaningful disclosure of credit terms so that the consumer will be able to \*\*\* avoid the uninformed use of credit." 15 U.S.C. § 1601 (2006). Pursuant to the broad the authority delegated by Congress (15 U.S.C. § 1604 (2006)), the Federal Reserve Board has promulgated a comprehensive set of rules, known as Regulation Z, to effectuate the TILA's purposes. 12 C.F.R. § 226 (1981); *Lanier Associates Finance, Inc.*, 114 Ill. 2d 1, 11 (1986). Relevant here, Regulation Z requires a seller to make five material disclosures to ensure that consumers understand the true cost of purchasing items on credit, rather than in cash: (1) the "amount financed," (2) the "finance charge," (3) the annual percentage rate, (4) the payment schedule, and (5) the total of payments. 12 C.F.R. § 226 (1981).

¶ 44    Here, the Temporary Car contract explicitly identified the "Amount Financed" as $28,115.19, the "Finance Charge" as $11,647.53, and, consequently, the "Total of Payments" as $39,762.72. The amount financed was clearly calculated by adding and subtracting certain itemized fees, taxes, and deductions from the listed "Cash Price" of $26,141.00. The contract also identifies the annual percentage rate as 11.99% and the payment schedule as 72 monthly payments of $552.26 beginning on February 24, 2008. Accordingly, the contract makes all the disclosures required under the TILA and Regulation Z.

¶ 45    Plaintiff, however, argues that South Chicago hid the true finance charge (and, by extension, the true annual percentage rate) by falsely inflating the cash price of the Temporary Car.

¶ 46    Regulation Z defines "finance charge" as "the cost of consumer credit as a dollar amount." 12 C.F.R. § 226.4(a) (2006). It is the sum of charges "imposed directly or indirectly by the creditor

as an incident to or a condition of the extension of credit." *Id.* However, the finance charge does not include "any charge of a type payable in a comparable cash transaction." *Id.* Stated differently, the finance charge is essentially the difference between what the customer actually pays by financing the item and what they would have paid had they paid cash (*i.e.* the cash price).

¶ 47 The key to plaintiff's argument is his contention that the true cash price of the Temporary Car was its MSRP, which he says was $15,980. In support of this position, plaintiff observes that "cash price" is defined in Regulation Z as "the price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction." See 12 C.F.R. § 226.2 (2006). From this definition, plaintiff concludes that the cash price of a vehicle is equivalent to its MSRP because that price is what a dealer would charge in the ordinary course of business.

¶ 48 Plaintiff's interpretation is incongruous with the clear purpose of the TILA, which is to inform consumers of the actual costs of purchasing with credit rather than cash in a particular transaction. His interpretation also ignores the fact that the price of a vehicle, unlike many other consumer goods purchased on credit, is subject to substantial negotiation such that two given customers might agree to pay different amounts for identical vehicles. Simply put, nothing in the record suggests that South Chicago offered to sell plaintiff the Temporary Car for $15,980 cash. Instead, the record shows that the parties negotiated the terms of the Temporary Car contract, including the cash price, and that plaintiff signed the contract with full knowledge and understanding of the terms. Indeed, plaintiff testified at his deposition that he "looked most importantly at the monthly payment" during the negotiations, and agreed to the contract terms because they were "designed to generate a monthly payment of about $550 which was an agreed

upon amount between [he] and [South Chicago]." While plaintiff could have perhaps negotiated a lower cash price, his failure to do so does not mean that South Chicago violated the TILA.

¶ 49    Furthermore, the three cases upon which plaintiff relies are distinguishable, as they all involved situations in which consumers were unknowingly charged amounts for using credit that they would not have been had they paid in cash. See *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 932 (7th Cir. 1998); *Gibson*, 112 F.3d at 287; *Taylor v. Bob O'Connor Ford, Inc.*, No. 97 C 0720, 1998 WL 177689, at * 7 (N.D. Ill. Apr. 13, 1998). In contrast, plaintiff does not allege that he was charged more because he paid in credit rather than in cash, but only that a hypothetical purchaser could have negotiated a cash deal for the MSRP. However, "[i]f a dealer merely charges what the traffic will bear, the fact that a *particular* credit customer may be paying a higher mark-up than a *particular* cash customer would not transform the difference in mark-ups into a finance charge" because "it would have in fact no causal relation to the extension of credit." *Gibson*, 112 F.3d at 286. Accordingly, the circuit court did not err in granting summary judgment for South Chicago on plaintiff's TILA claim.

¶ 50                          4. The Motor Vehicle Retail Installment Sales Act

¶ 51    Plaintiff also challenges the circuit court's grant of summary judgment to South Chicago on his MVRISA claims.

¶ 52    We first note that the parties apparently agree, correctly, that the MVRISA does not create a private a right of action or provide for damages to private individuals. See *Arca v. Colonial Bank & Trust Co. of Chicago*, 265 Ill. App.3d 498, 502 (1994). However, this court has held that a private plaintiff may invoke the MVRISA derivatively to prove claims of fraud. *Gainer Bank, N.A., v. Jenkins*, 284 Ill. App. 3d 500, 503 (1996). Accordingly, plaintiff contends on appeal that

he asserted violations of the MVRISA "not to recover damages under the Act, but in support of [his] fraud and consumer fraud claims against South Chicago." However, as we have already determined that plaintiff did not suffer actual damages as a result of South Chicago's alleged fraud, any fraud claim based on the MVRISA must also fail. Thus, summary judgment for South Chicago was appropriate.

¶ 53                                              5. Equitable Estoppel

¶ 54    Finally, plaintiff contends that the circuit court erred by not granting him summary judgment on his claim of equitable estoppel The general rule of equitable estoppel is that a party may not deny its statements or conduct to the detriment of a second party if those statements or conduct led the second party to do something it otherwise would not have done. *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 24. "Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party, who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001). To establish a claim of equitable estoppel, a plaintiff must show that (1) the defendant misrepresented or concealed a material fact, (2) the defendant knew the misrepresentation was untrue at the time it was made, (3) the defendant intended or expected the plaintiff to act on the misrepresentation, (4) the plaintiff did not know the misrepresentation was untrue at the time it was made or acted on, (5) the plaintiff reasonably relied on the misrepresentation in good faith, and (6) the plaintiff would be prejudiced if the defendant were permitted to deny the misrepresentation. *J.S. Reimer, Inc. v. Village of Orland Hills*, 2013 IL App (1st) 120106, ¶ 35.

¶ 55 Here, plaintiff's assertion of equitable estoppel was based on his allegation that South Chicago removed the MSRP sticker to conceal "the large amount by which the sale price of the Temporary Car stated in the Retail Installment Contract exceeded the sticker price of that car." However, according to plaintiff's own deposition testimony, he researched the MRSP of a new Versa before going to South Chicago and believed that the MSRP of the Temporary Car was "about $16,000 or high 15,000" at the time he negotiated the contract. Nevertheless, he agreed to a finance the vehicle at a substantially higher base price because it yielded his desired monthly payment, which was his chief concern. Thus, plaintiff either knew South Chicago's alleged misrepresentation of the MSRP was false or acted unreasonably in relying on it. In either case, plaintiff cannot invoke equitable estoppel. To the extent plaintiff contends that he agreed to the increased contract price because of South Chicago's promise to repurchase the Temporary Car, we note that the circuit court dismissed plaintiff's attempt to assert equitable estoppel with respect to the buy-back promise. In any event, the record demonstrates that it would also have been unreasonable as a matter of law for plaintiff to rely on the buyback promise, as he acknowledged that he read, understood, and signed documents that did not mention the promise, but explicitly stated that "no other agreement of any kind, verbal understanding, or promise will be recognized" and that "ALL promises that are owed to [him] regarding [the] transaction are in writing." (Emphasis in original). Under these circumstances, the circuit court properly granted summary judgment for South Chicago.

¶ 56                                     III. CONCLUSION

¶ 57 For the foregoing reasons, the judgments of the circuit court are affirmed.

¶ 58 Affirmed.